Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Anamay M. Carmel (SBN 298080)
ACarmel@PasichLLP.com
Caitlin S. Oswald (SBN 330974)
COswald@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:  (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIACOMCBS INC., a Delaware corporation,<br><br>     Plaintiff,<br><br>vs.<br><br>GREAT DIVIDE INSURANCE COMPANY, a North Dakota corporation,<br><br>     Defendant. | Case No.<br><br>**COMPLAINT FOR:  BREACH OF CONTRACT;  ANTICIPATORY BREACH OF CONTRACT; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;  AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ViacomCBS Inc. ("ViacomCBS") brings this action against defendant Great Divide Insurance Company ("Great Divide") and alleges as follows:

## NATURE OF THIS LAWSUIT

1.     ViacomCBS is a global media and entertainment company that creates and distributes content across a variety of platforms to audiences around the world. Together with third-party production companies, it produces numerous television

V006.002/308395.3

shows, such as *Yellowstone* and *Younger*, and live events, including Nickelodeon's *Kids' Choice Awards*. Consistent with long-established custom and practice in the television industry, ViacomCBS purchased an insurance policy from Great Divide to protect, and sold by Great Divide as protecting, ViacomCBS against losses should events preclude or disrupt the production of television shows or live events.

2.      Like many other businesses, ViacomCBS was forced to delay or cancel production for its television shows and live events due to SARS-CoV-2, which causes COVID-19; the subsequent actions and orders of state and local civil authorities; guidance from the Centers for Disease Control and Prevention; and the need to mitigate its losses and damages. After the outbreak of SARS-CoV-2 and COVID-19, ViacomCBS is informed and believes, and on that basis alleges, that SARS-CoV-2 was present or likely to be present on its property and the properties of others, thereby delaying the principal photography of over 100 television productions and forcing it to abandon productions like the 2020 *Kids' Choice Awards*. As a result, ViacomCBS has suffered, and continues to suffer, substantial financial losses, including unrecouped expenses, lost profits, and lost business opportunities.

3.      When ViacomCBS turned to Great Divide for the promised insurance, ViacomCBS reasonably expected Great Divide to cover its losses. However, instead of honoring its agreement with ViacomCBS, Great Divide interpreted the governing policy in an overly narrow and wrongful manner. Among other things, Great Divide has refused to acknowledge coverage for various losses, while improperly limiting the coverage available for other losses. As a result, Great Divide has deprived ViacomCBS of the full policy benefits it has the right to receive.

4.      Great Divide, for example, has refused to acknowledge that, pursuant to its and the insurance industry's long-established custom and practice and the relevant policy language, ViacomCBS is entitled to a third annual period of coverage without modification of the policy wording or cancellation or reduction of any of the policy's coverages, except rate revision, as necessary. Great Divide refused to honor the

1  existing policy terms.  Instead, Great Divide offered only to continue the policy for
2  its third annual period subject to a material reduction in the scope of insurance and/or
3  an exorbitant premium.  Specifically, Great Divide said that the policy would be
4  continued only with the addition of an exclusion applicable to losses relating to
5  COVID-19, thereby depriving ViacomCBS of the coverage that it purchased and was
6  promised.

7       5.     Great Divide has known for more than a decade that it and its insureds
8  face a substantial risk of loss from viruses and pandemics and, since 2006, has had
9  available to it an insurance industry standard-form exclusion applicable to certain
10 losses caused by viruses and bacteria.  However, in selling the policy to ViacomCBS,
11 Great Divide did not include any such exclusion.  In fact, Great Divide did nothing in
12 selling the policy to limit its liability for virus- or pandemic-associated risks.  Nor did
13 Great Divide warn ViacomCBS that even though it did not include a virus or
14 pandemic exclusion, it would interpret the policy as if it contained one.

15      6.     By this lawsuit, ViacomCBS seeks damages to compensate it for Great
16 Divide's contractual breaches and bad faith conduct.  It also seeks declaratory relief
17 confirming that its losses are covered, and that the policy remains in effect on the
18 same terms until such time as all productions declared to said policy are completed.

19      **JURISDICTION AND VENUE**

20      7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 based
21 on complete diversity of citizenship between the parties and because the amount in
22 controversy, exclusive of costs and interest, exceeds $75,000.

23      8.     This Court has personal jurisdiction over Great Divide because Great
24 Divide conducts business in the County of Los Angeles.

25      9.     Venue is proper in the Central District of California because a substantial
26 part of the events or omissions giving rise to ViacomCBS's claims occurred in this
27 District, including negotiation and delivery of the policy at issue.

28

V006.002/308395.3

## THE PARTIES

10.     ViacomCBS is a corporation organized and existing under the laws of Delaware with its principal place of business in New York.  ViacomCBS is authorized to and does conduct business in California.

11.     Great Divide is a corporation organized and existing under the laws of North Dakota with its principal place of business in Arizona. Great Divide also states that its "Domicile Address" is in Iowa and that its Administrative Office is in Texas. ViacomCBS is informed and believes, and on that basis alleges, that at all times material hereto, Great Divide was licensed to transact, and did transact, business in California and in the County of Los Angeles.

12.     ViacomCBS is informed and believes, and on that basis alleges, that Great Divide is part of the Berkley group of insurance companies, whose ultimate parent is W.R. Berkley Corporation ("Berkley").  ViacomCBS also is informed and believes, and on that basis alleges, that Great Divide sells policies, including the policy at issue here, via "Berkley Entertainment," an affiliated entity or fictitious name that also acts on behalf of Great Divide in adjusting claims for coverage.

13.     Berkley and Berkley Entertainment make statements and representations on behalf of themselves and Great Divide on their websites, https://www.berkley.com/ and https://www.berkleyentertainment.com/.  Berkley and Berkley Entertainment use these websites to market their insurance products; represent the nature of their insurance products, their policy underwriting, and their claims handling; and represent the quality of insurance and service their customers will get if they do business with them.  ViacomCBS is informed and believes, and on that basis alleges, that Great Divide authorized the statements and representations that Berkley and Berkley Entertainment have made on their websites and that those statements and representations are made on behalf of Great Divide.  ViacomCBS is informed and believes, and on that basis alleges, that when Berkley and Berkley

**COMPLAINT**

Entertainment say things through their websites, advertising, and statements, they are speaking on behalf of, and are authorized to speak on behalf of, Great Divide.

14.     Berkley Entertainment, in particular, has long represented to the public and to its customers, including ViacomCBS, that it has special expertise in providing insurance to companies and individuals in the entertainment industry.  For example, touting its experience in the entertainment industry, Berkley Entertainment states as follows on its website:

> **Over 25 years of underwriting risks in Entertainment & Sports**
>
> **One Focus**  Our one focus is entertainment insurance. We bring our decades of entertainment experience together to go beyond the basics, providing crafted coverage solutions to protect your clients.
>
> **Peerless Expertise**  We understand the exposures, complex coverages and extra commitment to customer service required by the Entertainment Industry.  We deliver with a consistently superior level of service and satisfaction.
>
> **Unrivaled Service**  Enduring professional relationships with trusted, expert resources are key to the way Berkley Entertainment conducts business. Each time you contact us, you will work with experts in claims, underwriting and loss control who are empowered to make decisions. We are committed to high service standards you can rely on.[1]

15.     Great Divide and Berkley understand that because of the pandemic and subsequent orders, businesses, including ViacomCBS, had to take steps to mitigate or reduce losses.  As Berkley publicly stated in its First Quarter 2020 Financial Results:

---

[1] https://www.berkleyentertainment.com/why-us/.

**COMPLAINT**

V006.002/308395.3

1  These are extraordinary times, impacting individuals and
2  businesses alike in unprecedented ways, and our thoughts
3  are with those most affected by the COVID-19 pandemic.[2]

4  16.  Indeed, Berkley itself has undertaken steps in connection with its in-
5  person events to protect against the spread of SARS-CoV-2 and COVID-19:

6  In light of the COVID-19 pandemic and in an effort to
7  protect the health and safety of the company's stockholders,
8  employees and communities, the Annual Meeting will be
9  held solely by remote communication in the form of an
10  audio webcast rather than an in-person event.[3]

11  **GREAT DIVIDE'S KNOWLEDGE OF THE RISK OF PANDEMICS**

12  17.  Great Divide and other insurers were repeatedly warned over the years
13  of the potential impact of pandemics.  In fact, in the months and years before the
14  outbreak of the COVID-19 pandemic, there were many publicly available reports
15  about the risks of pandemics and what insurers should do.  For example, in March
16  2018, one article cautioned:

17  Even with today's technology, a modern severe pandemic
18  would cause substantive direct financial losses to the
19  insurance community.  In addition, indirect losses would be
20  severe, most notably on the asset side of the balance sheet.[4]

21  18.  One insurance industry repository shows the "tip of the iceberg" about
22  how much information was available to insurers on the risk of pandemics.  The

23  ———————————————

24  [2] https://s22.q4cdn.com/912518152/files/doc_news/W-R-Berkley-Corporation-
Reports-First-Quarter-Results-2020.pdf.

25  [3] https://ir.berkley.com/news-and-events/news/news-details/2020/W-R-Berkley-
26  Corporation-to-Host-Virtual-Only-Annual-Meeting-of-Stockholders-on-June-12-
2020/default.aspx.

27  [4] "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018),
28  https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-
Pandemic-Can-Teach-Today-s-Insurers/.

**COMPLAINT**

Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."[5] The Association states on its website:

> The past 20 years [have] seen the rise of a number of pandemics. *Slate* recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well.[6]

The Association then lists more than 20 articles, reports, and white papers published since at least 2007, long before Great Divide sold ViacomCBS the policy at issue here.  One white paper warned as early as 2009 of a pandemic's consequences to the insurance industry:

> It is highly unlikely that the insurance industry would have the financial reserves to meet the worldwide claims arising out of a pandemic of this size.[7]

19.    Great Divide also has known, or should have known, for decades that its policies could be held to cover losses from the presence of a hazardous substance, such as a virus inside a building or because a building could not be used for its intended purpose or function.  As Great Divide has known, or should have known, for decades many courts have held that the presence of a hazardous substance in property, including the airspace inside a building, constitutes property damage and that there

---

[5] http://insurancelibrary.org/about-us/.

[6] http://insurancelibrary.org/pandemics-and-insurance/.

[7]  Allan Manning, *White Paper on Infectious Disease Cover* (updated 2009), http://www.lmigroup.com/Documents/Articles/White%20Paper%20on%20Infectious%20Disease%20Cover.pdf?mc_cid=f0cee24803&mc_eid=41023ebc2c.

**COMPLAINT**

V006.002/308395.3

1  may be "direct physical loss" to property even if the property is not physically

2  damaged.

3       20.    For example, Great Divide knows, or should have known, that in 1962—

4  59 years ago—a California Court of Appeal held that a property insurance policy

5  could cover loss or damage to a structure that had no physical damage or alteration.

6  *See Hughes v. Potomac Insurance Co.*, 199 Cal. App. 2d 239, 248-9 (1962) (rejecting

7  insurer's argument that there was no "direct physical loss" where insured's house had

8  been left partially overhanging a cliff after a landslide but had suffered no physical

9  damage, holding that common sense requires that the policy should not be interpreted

10  to exclude coverage in such circumstances "in the absence of a provision specifically

11  limiting coverage in this manner").

12       21.    Thus, Great Divide has known, or should have known, for decades that

13  its policies would be called on to pay perhaps hundreds of millions of dollars or more

14  to its insureds and, more specifically, knows that it could be obligated under its

15  policies to pay tens of millions of dollars to ViacomCBS for losses associated with

16  viruses and pandemics.

17       22.    Given the potential liability that insurers, including Great Divide, faced

18  under their policies for losses from pandemics, shortly after the outbreak of SARS in

19  2003, the insurance industry undertook to draft exclusions applicable to losses from

20  viruses and bacteria.  In 2006, the Insurance Services Office ("ISO"), the insurance

21  industry's drafting organization, considered the need to draft an exclusion that would

22  bar coverage for losses caused by a virus.[8]

---

[8] "ISO is a non-profit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal. 4th 645,671 n.13 (1995).

8

**COMPLAINT**

23.     On July 6, 2006, ISO prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance regulators.[9]   In that circular, it noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing that "[t]he universe of disease-causing organisms is always in evolution."[10] ISO further recognized, that viruses could cause property damage:

> Disease-causing agents may render a product impure (change its quality or substance) or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[11]

24.     In fact, ISO expressly warned that "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and create sources of recovery for such losses, contrary to policy intent."[12] ISO introduced a standard-form exclusion entitled "Exclusion Of Loss Due to Virus or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).

25.     Thus, since 2006, Great Divide could have used a "virus or bacteria" exclusion approved for use throughout the United States.  As one recent article

---

[9] *See ISO* Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[10] *Id.*

[11] *Id.*

[12] *Id.*

V006.002/308395.3

1   succinctly stated, "Insurers knew the damage a viral pandemic could wreak on
2   businesses.  So, they excluded coverage."[13]

3      26.    However, even though Great Divide was aware of the massive losses that
4   its insureds, including ViacomCBS, could face from a virus-related pandemic, it still
5   sold ViacomCBS the policy without a virus, pandemic, or any other potentially
6   applicable exclusion.

7                    **THE GREAT DIVIDE INSURANCE POLICY**

8      27.    Great Divide sold ViacomCBS a Television Production Portfolio Policy,
9   Policy No. CIM 7508608-10 (the "Policy") for a policy period consisting of three
10  annual anniversary policy periods of December 1, 2018, to December 1, 2019,
11  December 1, 2019, to December 1, 2020, and December 1, 2020, to December 1,
12  2021.  Policy, End. 6.  ViacomCBS bought the Policy to provide coverage if its
13  productions or live events were delayed or cancelled for a covered cause of loss.

14     28.    The Policy provides $30,000,000 of Cast coverage for Covered Persons,
15  $10,000,000 of Extra Expense coverage, $1,000,000 in Civil Authority coverage,
16  $10,000,000 for Imminent Peril coverage, and $1,000,000 in Ingress/Egress coverage.
17  Unless the Policy states otherwise, these limits of liability apply separately to each
18  loss and each insured production.

19     29.    Notably, the "Due Diligence" clause states that ViacomCBS is to "use
20  due diligence and do and concur in doing all things reasonably practicable to avoid or
21  diminish any loss or circumstances likely to give rise to a loss or claim insured under
22  this policy." The Policy states that it "will indemnify [ViacomCBS] for [its]
23  ascertained net loss of additional incurred expenses and/or increased costs necessarily
24  incurred by [ViacomCBS] to avoid or diminish any such loss or claim."  Policy,
25  General Conditions, § L.

---

[13] Todd Frankel, "Insurers knew the damage a viral pandemic could wreak on
businesses.  So they excluded coverage," *Washington Post* (Apr. 2, 2020).

10

**COMPLAINT**

30.    Under the Policy's Cast coverage form, Great Divide agreed to "pay to [ViacomCBS] such loss . . . as [ViacomCBS] directly and solely sustain[s] by reason of any **Covered Person** . . . being necessarily prevented by their death, injury or sickness, occurring during the term of insurance afforded by this Section, from commencing or continuing completing their respective duties in an **Insured Production**." *Id*., Cast, § I.

31.    "**Covered Person** means any artist, host, **Participant**, panelist, director, producer, executive producer, show runner, creator, writer, animal, animator, special effects or camera personnel or any other individual [ViacomCBS] deem[s] to be necessary to complete the **Insured Production**." *Id*., Definitions, § A.

32.    "**Insured Production** means any production declared to [Great Divide] and accepted by [Great Divide] for coverage under this policy." *Id*., Definitions, § G.

33.    "Loss" is defined under Cast coverage, in relevant part, as "any extra expenditure . . . [ViacomCBS] incur[s] in completing an **Insured Production** over and above the expenditure which, but for the happening of any one or more of the occurrences specified in Paragraph I. above, would have been incurred in completing said production. *Id*., Cast, § VI.A.

34.    The Cast coverage contains a provision stating that "[c]overage commences 180 days prior to the start of **Principal Photography** of an **Insured Production** and continues until the public airing of an **Insured Production**." *Id*., Cast, § IV.A. The Cast coverage also states: "Permission is granted to [ViacomCBS] to declare a starting date of **Principal Photography** at any time within the terms of the policy, provided [Great Divide] [is] given notice." *Id*., Cast, § IV.B.

35.    The Policy also gives ViacomCBS the right to abandon any production:

> In the event that the happening of one or more of the occurrences specified in Paragraph I. reasonably, practically and necessarily prevents the completion of an **Insured Production** irrespective of any completion or

V006.002/308395.3

delivery date requirements, [ViacomCBS] will have the
right to abandon the production and claim under this
Section for such actual expenditures [ViacomCBS] incur[s]
in an **Insured Production** solely and directly by reason of
the happening of one or more of the occurrences specified
. . . .

*Id.*, Cast, § VI.B.

36.     Under the Extra Expense coverage, Great Divide agreed to insure
ViacomCBS "against all risks of direct physical loss or damage to the property
covered from any external cause, except as hereinafter excluded." *Id.*, Extra Expense,
§ V.A.

37.     Great Divide also agreed to pay for

such loss . . . not including loss of earnings or profit, as
[ViacomCBS] sustain[s] by reason of such extra expense as
[ViacomCBS] necessarily incur[s] in the event of the
interruption, postponement or cancellation of an **Insured
Production** as a direct result of (1) damage to or destruction
of property or facilities used or to be used by [ViacomCBS]
and caused by an insured peril . . . or (2) as a direct result of
an extension of coverage . . . in connection with an **Insured
Production** and occurring during the term of coverage. . . .

*Id.*, Extra Expense, § I.

38.     Under the Extra Expense coverage, "Loss" is defined as

any extra expenditure incurred by [ViacomCBS] in
completing an **Insured Production,** over and above the
expenditure, which, but for the happening of any one or
more of the occurrences specified in Paragraph I., would
have been incurred in completing said **Insured**

12

**COMPLAINT**

**Production,** or such actual expenditure incurred by [ViacomCBS] in an **Insured Production** solely and directly by reason of the happening of an occurrence or occurrences as specified in Paragraph I.  Extra expenditure refers to the same costs defined [as] . . . **Insurable Production Costs**.

*Id*., Extra Expense, § VII.A.

39.   **Insurable Production Costs** mean "all costs, including overhead, chargeable directly to an **Insured Production,** except that the following costs are not included: . . . continuity, premiums paid for this insurance, [and] interest on loans." *Id*., Definitions, § E.

40.   The Policy's Extra Expense coverage, moreover, is "extended to insure against" "imminent peril," which is "defined as certain, immediate and impending danger of such probability and severity to persons or property that it would be unreasonable or unconscionable to ignore, subject to . . . the following: . . . [a]ny expenses incurred to avoid a loss resulting from imminent peril are covered to the extent that they serve to avoid a loss otherwise covered under this extension of coverage."  *Id.*, Extra Expense, § V.B.5.

41.   The Policy's Extra Expense coverage is also "extended to insure against" "ingress/egress," defined as ViacomCBS's "inability to access or depart a facility or location due to the closure or impassability of that facility's or location's access road and outside of the action of a Civil or Military Authority."  *Id*., Extra Expense, § V.B.7.

42.   The Policy's Extra Expense coverage is further "extended" to provide Producer's Indemnity coverage, which insures against "any risks of loss that manifest and first occur during the term of coverage of an **Insured Production** that are beyond the control of any of the following "**You**", "**Insured Production Entity**", contracted

V006.002/308395.3

party, **Covered Person,** and **Your** agents, representatives or contractors." *Id*., Extra Expense, §V.B.8.

43.   Under the Civil Authority coverage, Great Divide agreed to provide coverage for:

> interruption, postponement or cancellation of an **Insured Production** as a direct result of the action of a Civil or Military Authority that revokes [ViacomCBS's] permission to use or prohibits access to property or facilities within [ViacomCBS's] care, custody or control used or to be used in connection with an Insured Production and occurring during the term of coverage.

*Id*., Extra Expense, § V.B.4.

44.   The Extra Expense Coverage states that:

> coverage commences up to 180 (one hundred eighty) days prior to the start of **Principal Photography** stated on the Declaration Endorsement and continues for up to 18 (eighteen) months following the end of **Principal Photography,** or until the date on which a protection print or duplicate tape of an **Insured Production** has been completed and physically removed from the premises where the original negative or tape is located, or until coverage on an **Insured Production** is terminated by [ViacomCBS], whichever occurs first.

*Id*., Extra Expense, § IV.

45.   "**Principal Photography** means the continuous photographing or taping of the **Insured Production(s)** during the period of time from the starting date to the finishing date." *Id*., Definitions, §M.

14

**COMPLAINT**

46.     The Policy "is comprised of three annual anniversary policy periods," the third of which is December 1, 2020, to December 1, 2021.  *Id*., End. 6.  The Policy specifies that, with respect to these annual policy periods:

> The policy is subject to guaranteed rates for the first and second annual policy periods.  At the end of the second annual policy period, [Great Divide has] the right to review and revise for the third annual policy period, if necessary.
>
> In addition, the policy terms, conditions, exclusions and rates may be revised if any of the following occur or change:
>
> 1.     Material change in Senior/Risk Management Department staff;
>
> 2.     Material change in Risk Management protocols, safety procedures and inspections utilized to monitor exposures on productions.

*Id*.  Thus, this Endorsement promises ViacomCBS continuity of coverage, subject only to review and revision—not cancellation or non-renewal.

47.     ViacomCBS reasonably understood that the Policy's terms for the third annual period beginning on December 1, 2020, would not be subject to material changes absent enumerated circumstances that did not occur, and would not, in any event, be subject to cancellation or non-renewal before December 1, 2021.

## THE COVID-19 PANDEMIC AND
## ENSUING CIVIL AUTHORITY ORDERS

48.     In 2020, SARS-CoV-2 and the disease it causes, COVID-19, spread throughout the world, prompting the World Health Organization to declare a global pandemic.

49.     As explained by the World Health Organization:

V006.002/308395.3

PASICH·

> People can catch COVID-19 from others who have the [SARS-CoV-2] virus. The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth. People can also catch COVID-19 if they breathe in droplets from a person with COVID-19 who coughs out or exhales droplets.[14]

50.    Published reports state that the spread of SARS-CoV-2 is insidious because it can be readily transmitted by asymptomatic individuals—about 40% of all individuals who have COVID-19 are asymptomatic.[15]  Furthermore, reports state that pre-symptomatic persons carry the greatest viral-load (i.e., the quantity of virus in an individual's system) among all infected persons, meaning their ability to transmit SARS-CoV-2 is greater than that of symptomatic persons.[16]

51.    Published reports also state that aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in the air and infective

---

[14] *See* https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

[15] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, Business Insider (July 12, 2020). https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7.

[16] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ("We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.")

V006.002/308395.3

for 16 hours, until gravity ultimately forces them to the nearest surface.[17]  Studies have reported that SARS-CoV-2 can remain on surfaces for at least 28 days.[18]  According to these studies, the droplets thus physically alter the air and airspace in which they are present and the surfaces to which they attach and, by doing so, render property unusable for its intended purpose and function and require physical alterations to property, such as installing physical barriers restricting the movement of the aerosolized droplets.  These reports and studies explain that SARS-CoV-2 spreads from person to person primarily through fine aerosolized droplets containing the virus that are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.  These reports and studies state that human contact with the air, airspace, and surfaces can lead to transmission of the virus, including via numerous common touchpoints and areas, such as door handles and bathrooms.

52.     Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[19]  Thus, according to studies and reports, entering a location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

53.     Since January 1, 2020, and as of the filing of this Complaint, there have been more than 90,000,000 confirmed cases of COVID-19 throughout the world, with more than 1,900,000 deaths.[20]   In the United States, there have been more than

---

[17] *See* Leslie Tate, *Virus Survives In Air For Hours,* Tulanian (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.

[18] *See, e.g.*, CNBC, *Virus that causes Covid-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html**;** Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

[19] *See* "Airborne Transmission of SARS-CoV-2," *Science* (Oct. 16, 2020), available at https://science.sciencemag.org/content/370/6514/303.2.

[20] *See* https://covid19.who.int/.

17
**COMPLAINT**

23,133,900 confirmed cases of COVID-19 with more than 384,804 deaths.[21] Moreover, due in part to the initial absence of available tests, it has been reported that, at least in the United States, the number of people infected with SARS-CoV-2 may be ten times higher than reported.[22]

54.     Since the outbreak of SARS-Cov-2 and COVID-19, and in response to it, civil authorities throughout the world issued "stay-at-home" and "shelter-in-place" orders, travel restrictions, quarantines, and other orders, including orders requiring the suspension of non-essential business operations (collectively, "Closure Orders").[23]   In relevant part, the Closure Orders required citizens to stay at home, prohibited large gatherings, and mandated the continued closure of all non-essential in-person businesses.

55.     Because SARS-CoV-2 attaches to surfaces, lingers in the air and airspace of buildings, and can move through HVAC systems to spread throughout buildings, the presence of SARS-CoV-2 causes a distinct, demonstrable, physical alteration to property, thus causing "direct physical loss of or damage to property" as that phrase is used in the Policy.[24]   Just like invisible pollution in water *alters* the water, the presence of the SARS-CoV-2 virus *alters* the air and airspace in which it is found and the property on which it lands.   In fact, as documented, the presence of SARS-CoV-

---

[21] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[22] Fiona P. Havers, Carrie Reed, Travis Lim, et al., Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020, JAMA Internal Medicine (July 21, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2768834.

[23] *See*, *e.g*, The Council of State Governments, COVID-19 Resources for State Leaders,  https://web.csg.org/covid19/executive-orders/.

[24] *See* Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 11 (Sep. 11, 2020), https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment.

V006.002/308395.3

2-causes a physical transformation of the air and surfaces.  According to reports and studies, it changes the air and the surfaces into dangerous transmission mechanisms for SARS-CoV-2, rendering the affected property unsafe, unfit, and uninhabitable.

56.    As experts have noted, once surfaces are physically affected by SARS-CoV-2, they are referred to as fomites.[25]  Fomites consist of both porous and nonporous surfaces or objects that can become infected with a virus and serve as vehicles of transmission.[26]

57.    Because COVID-19 led to a global pandemic and SARS-CoV-2 is statistically certain to be carried by a number of individuals who work at and visit ViacomCBS's television sets and locations, SARS-CoV-2 is continually reintroduced to the air, airspace, and surfaces of covered properties and the property of third parties.

58.    The entertainment industry was hit particularly hard by the pandemic, orders of civil authorities, and the need to mitigate losses and damages.[27]  By the end of March 2020, nearly all media productions were forced to shut down and suspend operations indefinitely.[28]  As SARS-CoV-2 and COVID-19 spread around the world, ViacomCBS suffered losses and damages covered by the Policy.  These losses have been, and are being, suffered under the 2019-2020 policy period, even though their effects have continued after December 1, 2020.

59.    More than 100 of ViacomCBS's productions, including the *Kids' Choice Awards*, *Yellowstone*, and *Younger*, were directly impacted by these events and were among the hundreds of productions forced to postpone or shut down.  In direct

---

[25] Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, American Society for Microbiology (Mar. 13, 2007) (https://aem.asm.org/content/73/6/1687).

[26] *Id.*

[27] https://www.cnbc.com/2020/04/24/hollywoods-small-businesses-in-crisis.html.

[28] https://www.theguardian.com/film/2020/mar/19/loss-of-jobs-income-film-industry-hollywood-coronavirus-pandemic-covid-19.

19

**COMPLAINT**

1 response to these nationwide orders, ViacomCBS was forced to postpone production

2 dates or abandon productions altogether.

3 **GREAT DIVIDE'S BREACHES AND WRONGFUL CONDUCT**

4 60.     ViacomCBS timely notified Great Divide of each of its losses, and over

5 several months, provided Great Divide with information pertaining to those losses.

6 61.     Great Divide has arbitrarily and wrongfully taken the position that all of

7 ViacomCBS's losses arising from the pandemic, orders of civil authorities, and the

8 need to mitigate, are covered only under the Policy's Civil Authority coverage, which

9 has a $1,000,000 limit of liability.  By taking that position, Great Divide is depriving

10 ViacomCBS of the coverage it is entitled to under the Policy, including $30,000,000

11 for Covered Persons under the Cast Insurance and $10,000,000 under the Extra

12 Expense coverage (subject to separate sublimits of $1,000,000 for "Civil & Military

13 Authority;" $1,000,000 for "Civil & Military Authority Travel Delay;" $10,000,000

14 for "Imminent Peril;" $1,000,000 for "Ingress/Egress," and $750,000 for the

15 "Producer's Indemnity"), each as to "ANY ONE LOSS, ANY ONE DECLARED

16 PRODUCTION."   Policy, Coverage Schedule.   Great Divide also is depriving

17 ViacomCBS of the coverage that it expressly promised in the Policy for Channel 5

18 productions (which is stated in varying separate amounts in terms of English pounds,

19 subject to certain U.S. Dollar sublimits).  *Id.*

20 62.     In late April and early May, 2020, a representative of Great Divide had

21 a series of telephone conversations with ViacomCBS's representatives and claimed

22 that ViacomCBS's claims did not trigger Imminent Peril coverage because the claims

23 did not present "certain, immediate and impending danger" to persons or property that

24 "would be unreasonable or unconscionable to ignore."

25 63.     On June 24, 2020, ViacomCBS's representatives responded in writing,

26 stating that Great Divide's assessment was incorrect and elaborating on the reasons

27 why ViacomCBS is owed Cast coverage, Extra Expense coverage, Civil and Military

28 coverage, Imminent Peril coverage, and Ingress/Egress coverage.

V006.002/308395.3

64.     Also on June 24, 2020, counsel for ViacomCBS explained that while ViacomCBS was not yet aware of any Covered Person contracting SARS-CoV-2 or COVID-19 while working on its productions as of that date, ViacomCBS had suffered, and was suffering, covered losses.  As ViacomCBS explained, the Policy's "Due Diligence" provision called for ViacomCBS to take appropriate steps to prevent or reduce loss, such as the extensive steps it took in terminating and postponing its productions.  That Due Diligence provision, which applies to every coverage section of the Policy, also mandates that Great Divide pay ViacomCBS for its losses and expenses incurred in such efforts to prevent or reduce loss.

65.     ViacomCBS's counsel further explained that Great Divide is obligated to pay for ViacomCBS's losses under other coverages under Extra Expense:

- The ***Civil Authority Coverage*** was triggered:  There are multiple orders of Civil Authority that have revoked permission to use property or facilities or prohibited access to property or premises within the scope of the Civil Authority coverage.  Undoubtedly, [Great Divide] is aware that many orders were issued throughout the United States and around the world at the national, state, and local [levels].

- The ***Imminent Peril Coverage*** was triggered:  SARS-CoV-2 and COVID-19 have spread rapidly throughout the world, reaching the United States in January 2019.  Multiple health organizations, including the World Health Organization and the Center for Disease Controls, have concluded and repeatedly stated that the virus and the disease are dangers, that steps had to be taken to prevent their spread, that people need to "socially distance," that closures, travel restrictions, and personal protective equipment are essential to "flatten the curve."   Indeed, as noted above, Berkley itself has

21

**COMPLAINT**

recognized the imminent nature of the peril and the losses that would result if preventive actions were not taken immediately.

- The ***Ingress/Egress Coverage*** was triggered: Even absent orders of Civil Authority, the widespread presence of SARS-CoV-2, its "community spread," its presence for hours in air and airspace and on surfaces, created an inability to access facilities and locations.  Nothing in the Policy requires that the inability to access be caused by physical impediments (although those, too, would suffice).  And nothing in the Policy requires that access be impossible, but only that it be impaired. . . .

- The ***Producers Indemnity Coverage*** was triggered: This is a "catch-all" provision providing insurance for loss from any risk "beyond the control" of ViacomCBS and the specified parties.  There is no doubt here that the risks involved were beyond their control.

66.     Great Divide asserts that only Civil Authority coverage—the coverage with the lowest potentially applicable limit—applies to the television productions that were postponed or incurred additional costs.  Great Divide, however, has not provided any substantive evidence to justify that limit.  ViacomCBS is entitled to the maximum amounts of coverage needed to indemnify it for losses for the maximum periods of time provided by and under the Policy.

67.     Under the Policy's provision regarding annual review, ViacomCBS expected that the Policy would continue for the year following December 1, 2020.  ViacomCBS is informed and believes, and on that basis alleges, that when Great Divide sold ViacomCBS its Policy, Great Divide knew, and should have known, that ViacomCBS was relying on Great Divide's custom and practice, and that the third

annual policy period would be based on the same terms and conditions as stated in the Policy, subject only to warranted revisions and not subject to cancellation or non-renewal.

68.    ViacomCBS is informed and believes, and on that basis alleges, that when Great Divide took the positions referenced above, it knew that because of the pandemic, ViacomCBS would be unable to procure replacement insurance without a COVID-19 exclusion or, if it could, the insurance would be at a substantially higher price and on narrower terms, thereby jeopardizing ViacomCBS's ability to proceed with productions.  Great Divide also knew that because ViacomCBS would attempt to mitigate its damages by procuring replacement coverage, it would incur additional expense in doing so.  Despite these facts, Great Divide continued its wrongful conduct.

69.    ViacomCBS also submitted claims under the Abandonment provision of the Policy and may submit additional claims under the same provision.  These include a claim for losses incurred from the forced cancellation of the 2020 *Kids' Choice Awards*.

70.    Production of the *Kids' Choice Awards*, a live event, was scheduled to occur on March 22, 2020, at the Forum in Los Angeles, California.  The awards show was shut down on March 12, 2020.  It was cancelled because of the widely reported dangers posed by SARS-CoV-2 and COVID-19 and because of the orders of civil authorities.

71.    On March 4, 2020, Governor Newsom declared a state of emergency in California.  On March 11, 2020, Governor Newsom announced that all gatherings of 250 people or more should be rescheduled or cancelled.[29]  On March 12, 2020, Governor Newsom issued Executive Order No. N-25-20, ordering that: "All residents

---

[29] https://www.gov.ca.gov/2020/03/11/california-public-health-experts-mass-gatherings-should-be-postponed-or-canceled-statewide-to-slow-the-spread-of-covid-19/

V006.002/308395.3

are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."[30]

72.     Civil authorities continued to issue orders thereafter.  On March 16, 2020, the Los Angeles County Health Officer issued a civil authority order that prohibited "all indoor and outdoor, public and private events and gatherings within a confined space, where 50 or more members of the public [were] expected to gather at the same time."[31]   Additionally, on March 19, 2020, the Los Angeles Health Officer issued a "Safer at Home Order for Control of Covid-19," which prohibited all indoor and outdoor gatherings of ten or more persons, and closed all non-essential businesses.[32]

73.     After ViacomCBS submitted its claim to Great Divide, on October 13, 2020, Great Divide sent ViacomCBS a "reservation of rights" letter in which Great Divide incorrectly contended that there was no covered loss because the *Kids' Choice Awards* "were not cancelled or abandoned, but rather were postponed from March 22, 2020, to May 2, 2020."

74.     Great Divide asserted that the *Kids' Choice Awards* was completed and aired because ViacomCBS aired a different virtual show, *Kid's Choice Awards: Celebrate Together*.   As a result, Great Divide asserted that coverage was limited to the extra expense incurred to complete the virtual show and refused to cover any sunk costs from the *Kids' Choice Awards*.

75.     In an October 29, 2020 letter, ViacomCBS responded, explaining that the Nickelodeon *Kids' Choice Awards* is

---

[30]https://www.gov.ca.gov/wp-content/uploads/2020/03/3.12.20-EO-N-25-20-COVID-19.pdf

[31] https://covid19.lacounty.gov/covid19-news/public-health-issues-order-to-prohibit-group-events/

[32]http://file.lacounty.gov/SDSInter/lac/1070029_COVID-19_SaferAtHome_HealthOfficerOrder_20200319_Signed.pdf.

V006.002/308395.3

a live event produced annually since 1987. The event features celebrity guests, live performances, as well as audience engagement. The event has approximately 1,000 crew members, 75 to 100 talent engaged to perform and as award presenters and receivers, as well as 10,000 audience members in attendance.

76.     In that letter, ViacomCBS further explained that the virtual show was an entirely different production from the *Kids' Choice Awards*. Some of the many differences between the *Kids' Choice Awards* and the later virtual show include the production company, the number of crew (10 rather than 1,000), the host, the format, and the lack of performances and stunts. Additionally, the budget for the *Kids' Choice Awards* was significantly higher than the later virtual show, which was produced in-house.

77.     On December 7, 2020, on behalf of Great Divide, Berkley Entertainment sent ViacomCBS a "Supplemental Reservation of Rights" letter echoing its October 13, 2020 letter.

78.     On December 17, 2020, representatives of ViacomCBS spoke with representatives of Great Divide about its abandonment claim. ViacomCBS explained, in substance, that production was shut down to mitigate a potential cast claim on the cast and crew and the live event should be covered because the show could not be completed as intended and was subsequently abandoned by ViacomCBS. ViacomCBS further explained that all the elements of the live show could not be completed due to the spread of SARS-CoV-2 and that the network needed to produce a different show in-house that aired six weeks later to merely announce the award winners.

79.     On December 28, 2020, counsel for ViacomCBS sent Great Divide a letter in response to Great Divide's "reservation of rights" letters, explaining why

V006.002/308395.3

Great Divide should honor the Policy terms to provide Abandonment coverage and reconsider its coverage position.

80.     Instead of providing full Abandonment coverage, which includes sunk costs, and Extra Expense coverage, Great Divide has refused to acknowledge that the *Kids' Choice Awards* was abandoned and has further stated, contrary to the Policy's terms, that it would not pay for any losses incurred before the abandonment.  Great Divide has deprived ViacomCBS of the coverage that Great Divide agreed to provide in the Policy.

81.     In addition to insured losses from the abandonment of the *Kids' Choice Awards*, ViacomCBS has incurred millions of dollars in insured losses from delay and postponement of more than 100 of its television productions.

82.     To the extent not waived or otherwise excused, ViacomCBS has complied with the provisions in the Policy.  ViacomCBS is therefore entitled, on behalf of itself and all other insureds, to all benefits of insurance provided by the Policy.

83.     As a direct result of Great Divide's breaches, ViacomCBS has suffered and will continue to suffer damages.  Great Divide is liable for these damages.

## FIRST CAUSE OF ACTION

### (Breach of Contract Regarding the Policy's Third Anniversary Period)

84.     ViacomCBS realleges and incorporates by reference herein each allegation in paragraphs 1 through 83, above.

85.     Great Divide had a duty under the Policy, the law, and industry custom and practice to provide coverage during the Policy's third anniversary period on the same terms and conditions as provided during the Policy's first two periods unless circumstances not applicable here occurred.

86.     Great Divide breached its duties under the Policy by, among other things, refusing to provide coverage for the third anniversary period without substantially and prejudicially changing those terms or charging ViacomCBS an exorbitant premium.

V006.002/308395.3

87.    As a direct and proximate result of Great Divide's breaches, ViacomCBS has sustained, and continues to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.

## SECOND CAUSE OF ACTION

### (Breach of Contract Regarding Coverage for Losses on Productions)

88.    ViacomCBS realleges and incorporates by reference herein each allegation in paragraphs 1 through 83 above.

89.    By acting as alleged above, by limiting coverage to Civil Authority only, and by failing to agree to pay ViacomCBS for the full amount of the insured losses, Great Divide breached its duties under the Policy.

90.    As a direct and proximate result of Great Divide's breaches, ViacomCBS has sustained, and continues to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.

## THIRD CAUSE OF ACTION

### (Breach of Contract Regarding the *Kids' Choice Awards*)

91.    ViacomCBS realleges and incorporates by reference herein each allegation in paragraphs 1 through 83 above.

92.    ViacomCBS performed all obligations required of it under the Policy, except as otherwise excused.

93.    Great Divide breached its duties under the Policy by unreasonably characterizing the losses incurred by ViacomCBS as a postponement of the *Kids' Choice Awards* rather than the actual abandonment of the *Kid's Choice Awards* and by denying coverage for ViacomCBS's losses that are triggered by the Due Diligence clause in the Policy, and by otherwise acting as alleged above.

94.    As a direct and proximate result of Great Divide's breaches, ViacomCBS has sustained, and continues to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.

V006.002/308395.3

## FOURTH CAUSE OF ACTION

### (Anticipatory Breach of Contract)

95.    ViacomCBS realleges and incorporates by reference paragraphs 1 through 83 above.

96.    By acting as alleged above, Great Divide has clearly stated that it will not meet or perform its obligations under the Policy and will not pay for the full extent of ViacomCBS's covered losses.  Great Divide has done so even though ViacomCBS has fully cooperated with Great Divide in its investigation and has indicated that it is willing to perform any obligations that it might have under the Policy to the extent not waived or excused.  ViacomCBS is, in fact, prepared and ready to perform any such obligations.

97.    Therefore, if any of Great Divide's acts and omissions is not deemed to constitute a breach of the Policy, they constitute an anticipatory breach of the Policy.

98.    As a direct and proximate result of Great Divide's acts and omissions, ViacomCBS has sustained, and will continue to sustain, damages in an amount to be proven in excess of this Court's jurisdictional limit.

## FIFTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

99.    ViacomCBS realleges and incorporates by reference paragraphs 1 through 98 above.

100.   Implied in the Policy is a covenant that Great Divide would act in good faith and deal fairly with ViacomCBS, that Great Divide would not interfere with the rights of ViacomCBS to receive benefits due under the Policy, and that Great Divide would give at least the same level of consideration to ViacomCBS's interests as it gave its own interests.

101.   Great Divide also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the Policy.

V006.002/308395.3

102.   Instead of complying with these duties, Great Divide acted in bad faith by, among other things,

      a)  adopting the position that the only available limit of liability for the television productions is that for Civil Authority coverage;

      b)  failing to fully inquire into the bases that might support coverage for ViacomCBS's claims;

      c)  creating and implementing a course of action to automatically limit coverage for all production claims relating to SARS-CoV-2, COVID-19, and subsequent events;

      d)  unreasonably failing and refusing to honor its promises and representations in the Policy it issued to ViacomCBS;

      e)  putting its interests above those of ViacomCBS; and

      f)  otherwise acting as alleged above.

103.   In breach of the implied covenant of good faith and fair dealing, Great Divide did the things and committed the acts alleged above for the purpose of consciously withholding from ViacomCBS the rights and benefits which it is and was entitled to under the Policy.

104.   Great Divide's acts are inconsistent with the reasonable expectations of ViacomCBS, are contrary to established industry custom and practice, are contrary to its own express representations, are contrary to the express and implied terms of the Policy, and constitute bad faith.

105.   As a direct and proximate result of Great Divide's breach of the implied covenant of good faith and fair dealing, ViacomCBS has sustained, and continues to sustain, damages in an amount to be proven at trial.  ViacomCBS is also entitled to recover all attorneys' fees that it reasonably incurred, and continues to incur, in its efforts to obtain the benefits due under the Policy that Great Divide wrongfully withheld, and is withholding, in bad faith.  ViacomCBS is further entitled to interest

V006.002/308395.3

1  thereon at the maximum legal rate.  ViacomCBS continues to suffer damages because
2  of Great Divide's bad faith.

3      106.   ViacomCBS is informed and believes, and on that basis alleges, that
4  Great Divide—acting through one or more of its officers, directors, or other corporate
5  employees with substantial independent and discretionary authority over significant
6  aspects of Great Divide's business—performed, authorized, and/or ratified the bad
7  faith conduct alleged above.

8      107.   Great Divide's conduct is contemptible and has been done with a
9  conscious disregard of ViacomCBS's rights, constituting oppression, fraud, and/or
10 malice.  Great Divide has engaged in a series of acts designed to deny ViacomCBS
11 the benefits due under the Policy.  Specifically, Great Divide, by acting as alleged
12 above, consciously disregarded ViacomCBS's rights and forced ViacomCBS to incur
13 substantial financial losses, thereby inflicting substantial financial damage.  Great
14 Divide ignored ViacomCBS's interests and concerns with the requisite intent to injure
15 under California Civil Code section 3294.  ViacomCBS is therefore entitled to recover
16 punitive damages from Great Divide in an amount sufficient to punish Great Divide
17 and to deter similar conduct in the future.

18                    **SIXTH CAUSE OF ACTION**

19            **(Declaratory Relief Regarding Policy Renewal)**

20      108.   ViacomCBS realleges and incorporates by reference herein each
21 allegation in paragraphs 1 through 107 above.

22      109.   ViacomCBS contends that it is entitled to have the Policy renewed in
23 accord with Great Divide's custom and practice and the terms of the Policy.  Great
24 Divide disputes ViacomCBS's contentions and asserts that it has no obligation to
25 renew the Policy per the terms of the Policy, but instead can substantially reduce
26 ViacomCBS's insurance protection by offering a renewal policy that includes an
27 expansive COVID-19 exclusion and decreased limits.  For that reason, an actual and

28

V006.002/308395.3

1 justiciable controversy exists between ViacomCBS and Great Divide about the
2 matters alleged herein.

3     110. ViacomCBS seeks a judicial declaration in accord with its contentions
4 and rejecting Great Divide's contentions.

5     111. A declaration is necessary at this time so that the parties' dispute may be
6 resolved and that they may be aware of their prospective rights and duties.

7                **SEVENTH CAUSE OF ACTION**

8     **(Declaratory Relief Regarding Coverage for Losses on Productions)**

9     112. ViacomCBS realleges and incorporates by reference paragraphs 1
10 through 107 above.

11     113. ViacomCBS contends that it is entitled to coverage for its losses under
12 the Policy and that its contentions stated above are correct.

13     114. ViacomCBS is informed and believes, and on that basis alleges, that
14 Great Divide disputes ViacomCBS's contentions and contends that ViacomCBS is
15 not entitled to coverage under the Policy for much of its losses.

16     115. Therefore, an actual and justiciable controversy exists between
17 ViacomCBS and Great Divide concerning the matters alleged above.

18     116. ViacomCBS seeks a judicial declaration by this Court in accord with its
19 contentions and rejecting Great Divide's contentions and stating that ViacomCBS's
20 losses are insured under the Policy.

21     117. A declaration is necessary at this time so that the parties' dispute may be
22 resolved and that they may be aware of their prospective rights and duties.

23                **PRAYER FOR RELIEF**

24     WHEREFORE, ViacomCBS prays for relief as follows:

25            **ON THE FIRST CAUSE OF ACTION**

26     1. For damages, plus interest, according to proof at the time of trial;

27           **ON THE SECOND CAUSE OF ACTION**

28     2. For damages, plus interest, according to proof at the time of trial;

**COMPLAINT**

V006.002/308395.3

**ON THE THIRD CAUSE OF ACTION**

3.      For damages, plus interest, according to proof at the time of trial;

**ON THE FOURTH CAUSE OF ACTION**

4.      For damages, plus interest, according to proof at the time of trial;

**ON THE FIFTH CAUSE OF ACTION**

5.      For damages, including reasonable attorneys' fees, plus interest, according to proof at the time of trial;

6.      For punitive damages in an amount to be determined at the time of trial;

**ON THE SIXTH CAUSE OF ACTION**

7.      For a declaration in accord with ViacomCBS's contentions;

**ON THE SEVENTH CAUSE OF ACTION**

8.      For a declaration in accord with ViacomCBS's contentions;

**ON ALL CAUSES OF ACTION**

9.      For costs of suit herein; and

10.     For such other, further, and/or different relief as may be deemed just and proper.

DATED: January 14, 2021          PASICH LLP

                                 By:    /s/ Anamay M. Carmel
                                        Anamay M. Carmel
                                        Attorneys for Plaintiff

32
**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff ViacomCBS Inc. hereby demands a trial by jury in this action.

3     DATED: January 14, 2021          PASICH LLP

4

5                                          By:          */s/ Anamay M. Carmel*

6                                          Anamay M. Carmel

7                                          Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PASICH

**COMPLAINT**

V006.002/308395.3